# Exhibit A

# Genesis

**Master Confirmation Agreement for
Roger Ver (Seller)
Dated as of 2020/06/15 (the "Effective Date")
between
GGC International Limited ("Party A") and
Roger Ver ("Party B")**

The parties wish to facilitate the process of entering into and confirming Bitcoin Cash ("**BCH**") call option transactions (collectively, "**BCH Call Transactions**") and accordingly agree as follows:

1. **Application; Contractual Framework.**

   (a)   This Master Confirmation Agreement for BCH Call Option Transactions ("**Master Confirmation**") shall apply to each deliverable BCH Call Transaction (each, a "**Transaction**") entered into between Party A and Party B on or after the Effective Date, unless the Addendum or a confirmation of a BCH Call Transaction specifies that this Master Confirmation does not apply.

   (b)   As of the date hereof, Party A and Party B will be deemed to enter into (i) an ISDA master agreement in the form of the 2002 ISDA Master Agreement (Multicurrency – Cross Border) published by ISDA (the "**Form ISDA Master Agreement**") without any Schedule, except for the elections and modifications that are provided in Paragraph 7 of this Master Confirmation and (ii) an ISDA credit support agreement in the form of the 1995 ISDA Credit Support Annex (the "**Form ISDA CSA**") without any paragraph 13 thereof, except for the elections and modifications that are provided in Paragraph 8 of this Master Confirmation. In the event of any inconsistency between the provisions of the Form ISDA Master Agreement or the Form ISDA CSA and this Master Confirmation, this Master Confirmation will prevail for the purpose of any Transaction.

2. **Definitions**.

   (a)   The definitions and provisions contained in (i) the 2006 ISDA Definitions as published by the International Swaps and Derivatives Association, Inc. (**"ISDA"**) (the **"2006 Definitions"**) and (ii) the 1998 FX and Currency Option Definitions as published by ISDA, the Emerging Markets Trading Association and the Foreign Exchange Committee (the **"FX Definitions"** and, together with the 2006 Definitions, the **"Definitions"**) are incorporated by reference into this Master Confirmation except as expressly provided herein. In the event of any inconsistency between the Definitions and this Master Confirmation, this Master Confirmation will govern for the purposes of each Transaction. In the event of any inconsistency between the 2006 Definitions and the FX Definitions, the FX Definitions will govern for the purposes of each Transaction.

   (b)   For the purpose of the FX Definitions, each Transaction constitutes a Deliverable Currency Option Transaction.  For the purpose of the 2006 Definitions, each Transaction constitutes a Swap Transaction.

   (c)   Notwithstanding anything to the contrary in this Master Confirmation Agreement or any Transaction, Annex A of the FX Definitions, and any references to Annex A in Section 4.2 of the FX Definitions shall not be applicable to the Transaction, and the FX Definitions shall be read as if any reference to Annex A was removed from the FX Definitions.

3. **Transaction Confirmation**: The parties shall confirm the Economic Terms (as defined in paragraph 4 below) of each BCH Call Transaction in a Confirmation (each

# Genesis

such Confirmation, a "**Transaction Confirmation**"). Each Transaction Confirmation may be executed and delivered in counterparts (including by facsimile transmission), or an exchange of e-mails. Each Transaction Confirmation shall be deemed to incorporate and be subject to all of the terms of this Master Confirmation. This Master Confirmation, together with each Transaction Confirmation, constitutes a "Confirmation" for purposes of the Form ISDA Master Agreement. Each Transaction Confirmation shall be deemed to incorporate the general terms for all Transactions specified in paragraph 5 and the disruption fallbacks and adjustment conventions specified in paragraph 6.

**4.  BCH Call Transaction Economic Terms:**

| | |
|---|---|
| Trade Date: | As specified in the Transaction Confirmation. |
| Reference Currency: | BCH. BCH shall be deemed to be a "currency" for the purpose of the Definitions. |
| Currency Option Type: | Call |
| Call Currency | Reference Currency |
| Call Currency Amount: | The amount of the Reference Currency (which may be a fractional amount) as specified in the Transaction Confirmation. |
| Strike Price: | The amount of USD per 1.00 whole unit of the Reference Currency as specified in the Transaction Confirmation. |
| Expiration Date: | As specified in the Transaction Confirmation. |
| Expiration Time: | As specified in the Transaction Confirmation. |
| Settlement Date: | As specified in the Transaction Confirmation. |
| Premium: | USD Amount as specified in the Transaction Confirmation. |
| Premium Payment Date: | Trade Date |
| Account Details: | As specified in the Transaction Confirmation. |

**5.  General Terms:**

| | |
|---|---|
| Transaction Type: | Currency Call Option |
| Settlement: | Deliverable |
| Currency Option Style: | European |
| Seller: | Party B |
| Buyer: | Party A |
| Settlement Currency: | USD |
| Settlement Rate: | Means the exchange rate stated on the Fixing Reference expressed as the USD amount per 1.00 BCH on any Valuation Date. |
| Fixing Reference: | Tradeblock BCX Index rate |
| Calculation Agent Determination | Applicable |

# Genesis

|  |  |
|---|---|
| of Settlement Rate: | |
| Business Day: | Any day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in New York. |
| Business Day Convention: | Following |
| Calculation Agent: | Party A |

**6.  Disruption Events and Fallbacks:**

| | |
|---|---|
| Event Currency: | BCH |
| Non-Event Currency: | USD |
| Disruption Event(s): | |
| (a) General Inconvertibility: | Applicable |
| Disruption Fallback: | No-Fault Termination |
| (b) General Non-Transferability: | Applicable. |
| Disruption Fallback: | No-Fault Termination |
| (c) Calculation Agent Determination of Disruption Event: | Applicable |

Disruption Fallback(s):

| | |
|---|---|
| Modified Calculation Agent Adjustment | Means that the Calculation Agent shall in its sole discretion either: |
| | (1)  make such adjustment to the exercise, settlement, payment or any other terms of the Transaction as the Calculation Agent determines appropriate to account for the economic effect on the Transaction of any Adjustment Event (including adjustments to account for changes in volatility, expected dividends or other distributions, or liquidity relevant to the Reference Currency or to the Transaction), and determine the effective date of that adjustment; or |
| | (2)  if the Calculation Agent determines that no adjustment that it could make under the previous clause (1) will produce a commercially reasonable result, the relevant Transaction shall terminate, in which case "Cancellation and Payment" will be deemed to apply. |
| Cancellation and Payment | Means the Transaction will be cancelled as of the effective date of the Adjustment Event (as determined by the Calculation Agent) and any |

# Genesis

| | |
|---|---|
| | payment to be made by one party to the other shall be the Calculation Agent Adjustment Amount. |
| Adjustment Events: | Upon the occurrence of a Potential Adjustment Event that has a 5% or greater effect on the theoretical value of (a) one unit of the Reference Currency or (b) the Transaction any time during the 14 calendar day period immediately following the occurrence of such Potential Adjustment Event (an "**Adjustment Event**"), Party A may in its sole discretion elect Modified Calculation Agent Adjustment. For purposes of determining whether an Adjustment Event has occurred, the theoretical value of one whole unit of the Reference Currency, as applicable, at any time during the 14 calendar day period immediately following the occurrence of a Potential Adjustment Event shall be compared to the value of one whole unit of the Reference Currency, as applicable, as of the point in time immediately prior to the occurrence of such Potential Adjustment Event, with reference to the Settlement Rate at such time. |
| Potential Adjustment Event: | "Potential Adjustment Event" means any of the following:

(1)    a subdivision, consolidation or reclassification of the Reference Currency, or any similar action in respect of the underlying protocol of the Reference Currency;

(2)    a free distribution (including but not limited to an "airdrop") or dividend of the Reference Currency, any other Virtual Currency, cash, or any other asset to existing holders of such Virtual Currency by way of bonus;

(3)    a change in the operating rules of the underlying protocol of the Reference Currency (i.e., a "fork"), capitalization or otherwise;

(4)    a swap, migration, conversion or exchange of the Reference Currency into or for another asset (which, for the avoidance of doubt, does not include the Reference Currency);

(5)    the imposition of, change in or removal of an excise, sales, use, value-added, transfer, stamp, documentary, recording or similar tax on, or measured by reference to, the Reference Currency or any Virtual Currency into which or for which it may be exchanged (other than a tax on, or measured by reference to overall gross or net |

# Genesis

|  |  |
|---|---|
|  | income) by any government or taxation authority after the Trade Date, if the direct effect of such imposition, change or removal is to raise or lower the Settlement Rate on the Settlement Date from what it would have been without that imposition, change or removal; |
|  | (6)   A generalized regulatory enforcement initiative by one or more government authorities on Virtual Currency exchanges, miners or others focused on price manipulation, criminal activity and like activity or effects; or |
|  | (7)   any other event that has a diluting or concentrative effect on the theoretical value of (a) one unit of the Reference Currency or (b) the Transaction. |
| Virtual Currency | Any type of digital unit (including BCH) that is used as a medium of exchange or a form of digitally stored value, including but not limited to digital units of exchange that (A) have a centralized repository or administrator, (B) are decentralized and have no centralized repository or administrator, and/or (C) may be created or obtained by computing or manufacturing effort. |

[Section 7 appears on next page]

# Genesis

**7. Form ISDA Master Agreement:**

(a)  The parties agree to use commercially reasonable efforts promptly to negotiate, execute, and deliver an agreement in the form of the Form ISDA Master Agreement with such modifications as the parties will in good faith agree.

(b)  Upon execution and delivery by the parties of such an agreement, this Master Confirmation shall supplement, form part of, and be subject to that agreement. All provisions contained in or incorporated by reference in that agreement upon its execution will govern this Master Confirmation except as expressly modified below. Until the parties execute and deliver that agreement, this Master Confirmation, together with all other documents referring to the Form ISDA Master Agreement confirming the Reference Currency Transactions entered into between us (notwithstanding anything to the contrary in a Transaction Confirmation), shall supplement, form a part of, and be subject to, an agreement in the form of the Form ISDA Master Agreement as if an agreement had been executed in such form (but without any Schedule), except for the following elections:

  i.  <u>Governing Law</u>: New York.

  ii.  <u>Termination Currency</u>: U.S. Dollars.

  iii.  <u>Multiple Transaction Payment Netting</u>: Applicable.

  iv.  <u>Specified Entities of Party B</u>: All Affiliates.

  v.  <u>Process Agent</u>. For the purposes of Section 13(c) of the Form ISDA Master Agreement, Party A appoints as its Process Agent: Genesis Global Trading, Inc.  Party B appoints himself, Roger Ver, as its Process Agent.

  vi.  <u>Offices</u>:  Party A is not a multibranch party and acts from its office in New York.   Party B is not a multibranch party and acts from its office in Saint Kitts and Nevis.

  vii.  <u>Credit Support Document</u>:  The deemed credit support annex as described in paragraph 8 (Margin).

  viii.  <u>Payee Tax representations of Party B</u>: Party B represents that it is a a "foreign person" (as that term is used in section 1.6041-4(a)(4) of the U.S. Treasury Regulations) for U.S. federal income tax purposes and "exempt" within the meaning of sections 1.6041-3(p) and 1.6049-4(c) of the U.S. Treasury Regulations from information reporting on U.S. Internal Revenue Service Form 1099 and backup withholding.

  ix.  <u>Documents to be Delivered by Party B prior to the first Transaction</u>:

  1. Identification as per onboarding process.

  2. IRS Form W-8ECI (or any successor thereto) in duplicate, including appropriate attachments, that eliminates U.S. federal withholding tax and backup withholding tax on payments under this Agreement.

(c)  For purposes of Withholding Tax imposed on payments to non-US counterparties under the United States Foreign Account Tax Compliance Act, or FATCA:

  (i)  "Indemnifiable Tax" as defined in Section 14 of the Form ISDA Master Agreement shall not include any U.S. federal withholding tax imposed or collected pursuant to Sections 1471 through 1474 of the U.S.

# Genesis

Internal Revenue Code of 1986, as amended (the "Code"), any current or future regulations or official interpretations thereof, any agreement entered into pursuant to Section 1471(b) of the Code, or any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement entered into in connection with the implementation of such Sections of the Code (a "**FATCA Withholding Tax**"),

(ii) for the avoidance of doubt, a FATCA Withholding Tax is a Tax the deduction or withholding of which is required by applicable law for the purposes of Section 2(d) of the Form ISDA Master Agreement, and

(iii) if the parties each independently decide to adhere to any ISDA Protocol on FATCA Withholding Tax, upon effective adherence by both parties, the provisions of such Protocol shall supersede the foregoing provision) on the Trade Date of the first such Transaction between us. Additionally, the parties agree that the definitions and provisions contained in the Attachment to the 2010 Short Form HIRE Act Protocol published by ISDA on November 30, 2010 are incorporated into and apply to this Agreement as if set forth in full herein. The definition of "Indemnifiable Tax" shall not include any Dividend Equivalent Tax.

(d) For the avoidance of doubt, any Transaction entered into prior to the execution of the Form ISDA Master Agreement and this Master Confirmation shall be subject to the terms of such ISDA Form and Master Confirmation as though such Transaction had been entered into after the parties had executed such ISDA Form and Master Confirmation between them.

**8. Margin; Form ISDA CSA**

(a) The parties agree to use commercially reasonable efforts promptly to negotiate, execute, and deliver a security agreement in the form of the Form ISDA CSA, with such modifications as the parties will in good faith agree.

(b) Upon execution and delivery by the parties of such a security agreement, this Master Confirmation shall supplement, form part of, and be subject to that security agreement. All provisions contained in or incorporated by reference in that agreement upon its execution will govern this Master Confirmation except as expressly modified below. Until the parties execute and deliver that security agreement this Master Confirmation, this Master Confrmation shall constitute a security agreement, and together with all other documents referring to the Form ISDA Master Agreement and the Form ISDA CSA confirming Transactions entered into between the parties (notwithstanding anything to the contrary in a Transaction Confirmation), shall supplement, form a part of, and be subject to, an agreement in the form of the Form ISDA CSA as if an agreement had been executed in such form and with the following Paragraph 13 elections:

(1) <u>Eligible Collateral</u>:

a. Party A: Not applicable

b. Party B:

i. USD Cash; valuation percentage 100%.;

ii. the Reference Currency; valuation percentage 100% at Spot Rate.

(2) <u>Independent Amount</u>:

DocuSign Envelope ID: 7C6C1A35-8E49-4588-9010-586641C89F07
Case 1:23-cv-01560-GHW   Document 6-1   Filed 03/06/23   Page 9 of 12

# Genesis

    a. Party A: None

    b. Party B: As set forth in the related Transaction Confirmation

 (3) <u>Threshold</u>:

    a. Party A: Infinity

    b. Party B: As set forth in the related Transaction Confirmation

 (4) <u>Minimum Transfer Amount</u>

    a. As set forth in the related Transaction Confirmation

 (5) <u>Rounding</u>: The Delivery Amount and the Return Amount shall be rounded down to the nearest integral multiple of USD100.

 (6) <u>Conditions Precedent and Secured Party's Rights and Remedies</u>: The Termination Event for Illegality will be a «Specified Condition» for Party B, which will be the Affected Party.

 (7) <u>Holding and Using Posted Collateral</u>. Party A and its Custodian shall be entitled to hold Posted Collateral pursuant to Paragraph 6 of the Form ISDA CSA. Paragraph 6(e) applies to all Transactions.

**9. Relationship Between the Parties**

 a. <u>No Reliance, etc</u>. Each party represents that (i) it is entering into the Transaction evidenced hereby as principal (and not as agent or in any other capacity); (ii) neither the other party nor any of its agents are acting as a fiduciary for it; (iii) it is not relying upon any representations except those expressly set forth in the Agreement or this Confirmation; (iv) it has not relied on the other party for any legal, regulatory, tax, business, investment, financial, and accounting advice, and it has made its own investment, hedging, and trading decisions based upon its own judgment and upon any view expressed by the other party or any of its agents; and (v) it is entering into each Transaction with a full understanding of the terms, conditions and risks thereof and it is capable of and willing to assume those risks.

 b. <u>No Regulated Swaps Entity</u>. Each party represents that (i) it is not provisionally registered with the United States Commodity Futures Trading Commission (the "**CFTC**") as a swap dealer or major swap participant (each as defined in the United States Commodity Exchange Act ("**CEA**") and rules promulgated thereunder) and is not a U.S. Person pursuant to applicable CFTC guidance (each, a "**DF Swap Entity**"), (ii) it is not guaranteed by a DF Swap Entity, (iii) it is not a financial counterparty for purposes of Regulation (EU) No 648/2012 on OTC derivatives, central counterparties and trade repositories ("EMIR") and (iv) it has negotiated the Transaction exclusively from the offices described in paragraph 7 above.

 c. <u>Eligible Contract Participant</u>. Each party represents that it is an "eligible contract participant" as defined in the CEA and rules and other guidance of the CFTC promulgated thereunder.

 d. <u>No Retail Commodity Transaction</u>. Party B represents that no Transaction is a "retail commodity transaction" as defined in Section 2(c)(2)(D) of the CEA.

 e. <u>Dodd-Frank Reporting</u>. Party A will act as the "reporting counterparty" as required by Parts 43, 45 and 46 of Title 17, Chapter 1 of the CFTC's regulations for all Transactions under this Agreement. Party B appoints Party A to perform the reporting obligations on its behalf and Party A accepts that appointment.

 f. <u>USA PATRIOT Act Notice</u>. Party A hereby notifies Party B that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26,

2001)) (the "**Act**"), it is required to obtain, verify and record information that identifies Party B, which information includes the name and address of Party B and other information that will allow Party A to identify Party B in accordance with the Act.

    g.    <u>Selected Risks of Virtual Currency Options</u>. PARTY B ACKNOWLEDGED THAT THE RISK OF LOSS IN TRADING VIRTUAL CURRENCIES SUCH AS BCH, CAN BE SUBSTANTIAL AND, THEREFORE, PARTY B HAS CAREFULLY CONSIDERED WHETHER SUCH TRADING IS APPROPRIATE FOR IT IN LIGHT OF ITS CIRCUMSTANCES AND FINANCIAL RESOURCES. IT IS AWARE OF THE FOLLOWING RISKS OF VIRTUAL CURRENCY TRADING:

i. The volatility and unpredictability of the price of Virtual Currency relative to fiat currency may result in significant loss over a short period of time. Certain virtual currencies have experienced daily price volatility of more than 20%. This could result in an Adjustment Event under a Transaction.

ii. The risk of losing one's entire investment increases as a Call Option goes out of the money and as expiration nears.

iii. The Reference Currency is not legal tender, is not backed by the government, and accounts and value balances are not subject to Federal Deposit Insurance Corporation or Securities Investor Protection Corporation protections.

iv. Legislative and regulatory changes or actions at the state, federal, or international level may adversely affect the use, transfer, exchange, and value of Virtual Currency including the Reference Currency.

v. Transactions in the Reference Currency or other Virtual Currency may be irreversible, and, accordingly, losses due to fraudulent or accidental transactions may not be recoverable.

vi. Some Virtual Currency transactions shall be deemed to be made when recorded on a public ledger, which is not necessarily the date or time that the customer initiates the transaction.

vii. The value of the Reference Currency or other Virtual Currency may be derived from the continued willingness of market participants to exchange fiat currency or other Virtual Currency for it, which may result in the potential for permanent and total loss of value of a particular Virtual Currency (such as the Reference Currency) should the market for that Virtual Currency disappear.

viii. There is no assurance that a person who accepts a Virtual Currency as payment on any Trade Date or Exercise Date will continue to do so in the future.

ix. The nature of Virtual Currency may lead to an increased risk of fraud or cyber-attack. A cybersecurity event could result in a substantial, immediate and irreversible loss for market participants that trade virtual currencies. Even a minor cybersecurity event in a Virtual Currency is likely to result in downward price pressure on that product and potentially other Virtual Currencies.

x. The ability to participate in forks could also have implications. For example, one could experience losses if one hold Virtual Currency position through an exchange that does not participate in a fork that creates a new product.

# Genesis

  xi.  PARTY A AND ITS CUSTODIAN MAY BE SUBJECT TO ALL OF THESE RISKS WITH RESPECT TO BCH HELD AS COLLATERAL FOR ANY TRANSACTION.

  xii.  VIRTUAL CURRENCY SPOT MARKETS ARE NOT REGULATED BY THE COMMODITY FUTURES TRADING COMMISSION.  One should consult an attorney, accountant and/or financial advisor and sufficiently understand the Virtual Currency markets and risks and carefully consider whether Virtual Currency is appropriate for one in light of their own financial circumstances.

[Signatures appear on next page]

# Genesis

In witness whereof, Party A and Party B have executed this Master Confirmation as of the date first written above.

**Party A**

**GGC International Limited**

By: *Michael Moro* (DocuSigned by: 705B2FE45937490...)
Name: Michael Moro
Title: CEO

**Party B**

**Roger Ver**

By: *Roger Ver* (DocuSigned by: 18A112E39A55427...)
Name: Roger Ver
Title: